FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★ MAR 29 2010

P.M.
TIME A.M.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
RAFAEL URENA

                Petitioner,

    -against-

WILLIAM R. LAPE, Superintendant,

                Respondent.
------------------------------------------------------------x

**MEMORANDUM and ORDER**

07-CV-548 (SLT)(CLP)

**TOWNES, United States District Judge:**

Rafael Urena ("Petitioner") was convicted on July 8, 2003 in the Supreme Court of New York, Queens County, on one count of Sodomy in the Second Degree, N.Y. Penal Law § 130.45, three counts of Sexual Abuse in the Second Degree, N.Y. Penal Law §130.60(2), and Endangering the Welfare of a Child, N.Y. Penal Law § 260.10(1). In 2007, after exhausting his direct appeal, Petitioner commenced this action by filing a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the reasons set forth below, the petition is denied and this action is dismissed.

## BACKGROUND

At approximately 6:55 p.m. on May 23, 2002, police responded to a 911 call from the family of thirteen-year old Andrew Beltre. Beltre alleged that Petitioner, a teacher at a nearby after-school program that Beltre attended, lured Beltre into his boarding-house and committed numerous sexual acts on Beltre after the program had ended on the night of May 23. Specifically, Beltre alleged Petitioner shoved his penis against Beltre's buttocks, groped Beltre's penis, and pulled Beltre's pants down and sucked on his penis for thirty to forty seconds. After a brief investigation with the family, police arrested Petitioner at approximately 7:25 p.m. in the

1



same building that housed the after-school program. At the time of the arrest, Petitioner was in the midst of teaching an adult-education course. Tr. 415, 419-21. Police also escorted Beltre to a nearby hospital, where medical personnel examined Beltre.

Beltre's daily routine on schooldays consisted of attending school, traveling by bus to his parents' grocery store, and then attending the after-school program. Beltre would arrive at his parents' store at about 3 p.m., and from there, walk five blocks to the after-school program. The program usually lasted from 4 p.m. until 6 p.m. *Id.* at 490, 494. At the end of the night's program, Beltre would go home with his cousin Anthony. Anthony, however, did not attend the program on May 23, 2002. *Id.* at 548. Petitioner was the sole teacher at the program, along with two assistants. Beltre attended the program for about six to seven months prior to May 23, 2002, and Petitioner was his teacher throughout this time. *Id.* at 491-92.

### *The Prosecution's Case*

At trial, Beltre testified that on May 23, 2002, toward the end of the day's after-school program, Petitioner asked him to accompany Petitioner to a store to buy soda for a party the program would be holding the next day. Beltre agreed, and estimated they left the building between 5:50 p.m. and 6:00 p.m. *Id.* at 494. Beltre did not know where they were going, but after eight or nine blocks they stopped in front of Petitioner's boarding-house. *Id.* at 499. Petitioner told Beltre he wanted to stop by to get his coat from inside the house, ostensibly because it was chilly outside, and asked Beltre to come inside. *Id.* at 500.

Beltre testified that once inside, Petitioner sat on a chair and directed Beltre to sit on the bed and remove his shirt. *Id.* at 505. After Beltre complied, Petitioner told Beltre to come towards him on the chair. With Beltre's back facing him, Petitioner grabbed Beltre and pulled Beltre towards him. Petitioner then shoved his penis against Beltre's buttocks. While this

occurred, Beltre repeatedly told Petitioner that he was scared, but Petitioner continued and reached beneath Beltre's pants and groped his penis. Petitioner then directed Beltre back to the bed, and explained to Beltre that he would learn about these things when he got older. *Id.* at 505-09.

Petitioner followed Beltre to the bed, pulled Beltre's pants down, and sucked on Beltre's penis for thirty to forty seconds. Beltre testified that while this was occurring, he was "praying to God" and hoping "that someone would take care of [him]" and that "nothing bad would happen to [him]." *Id.* at 510-11. When Petitioner stopped, Beltre pulled his pants back up. Petitioner then asked Beltre if he wanted to see Petitioner's penis, and Beltre told him that he did not. *Id.* at 511-12.

Petitioner was still inside the house when Beltre left. Beltre testified it took approximately fifteen to twenty minutes to walk to his parents' store because he was unfamiliar with the area, and he stopped to ask for directions along the way. *Id.* at 515. When Beltre arrived at the store, he saw his twenty-year-old sister, Beri Beltre ("Beri"). Beri testified that Beltre arrived at the store between 6:30 p.m. and 6:45 p.m., and that he looked pale when he got there. Beltre hugged Beri and told her that Petitioner had taken him home and "sucked his dick." *Id.* at 454-57, 515. The family called the police at about 6:50 p.m. *Id.* at 457.

Police Officer Stephen Jones responded to the family's 911 call and arrived at the grocery store at around 6:55 p.m. or 7:00 p.m. *Id.* at 410-11. After a twenty-five minute interview with the family, Jones traveled to the building where Beltre attended the after-school program. Petitioner was there teaching an adult-education course, and Jones arrested Petitioner at approximately 7:20 p.m. or 7:25 p.m. *Id.* at 415, 419-21.

Dr. Sherry Spicuic, the supervising emergency-room pediatrician who examined Beltre, testified that based on information that a sexual assault had occurred, she thoroughly examined Beltre. A Rape Kit was prepared by collecting dry swabs from his penis, rectum, and throat. *Id.* at 344-46, 348. Ero Azanli of the Office of the Chief Medical Examiner, an expert in the field of forensic biology, testified that swabs from the rape kit and the underwear recovered from Beltre tested negative for the presence of saliva and semen. *Id.* at 602, 624, 627-28, 632. Aznali also gave several reasons why, if there had been saliva on the penis, and a dry penile swab was performed, the swab could still have tested negative for saliva. These reasons included: the method of collection, the passage of time, contact with other surfaces, and the amount and condition of saliva initially present. *Id.* at 633-39. On cross-examination, Aznali conceded that the absence of amylase, an enzyme in saliva, was strong evidence that Petitioner's saliva was never in the area of Beltre's body within some reasonable period of time.[1] *Id.* at 647.

*The Defense's Case*

Despite his failure to file a notice of alibi as required by statute and over the prosecution's repeated objections, Petitioner was permitted to present the testimony of two alleged alibi witnesses. Amarilis Moran, a student studying English as a second language in Petitioner's night class, testified that on May 23, 2002, she arrived at 6:40 p.m. for Petitioner's 7:00 p.m. class. Moran testified she saw Petitioner preparing lessons and erasing the blackboard when she arrived. *Id.* at 693-94. Jose Delarosa, the father of an eight-year-old girl in

---

[1] In addition to the testimonial evidence, the prosecution introduced Beltre's medical records, the medical examiner's report, photographs of the school and Petitioner's house, and a map of the area marked to show the locations of the after-school program, Petitioner's boarding-house, and the parents' store.

4

Petitioner's after-school program, testified that on May 23, 2002, he arrived between 6:30 p.m. and 6:33 p.m. to pick up his daughter and saw Petitioner at the program.[2]

*Summations and Verdict*

Defense counsel's summation highlighted the prosecution's timetable of events and argued that it created reasonable doubt. First, counsel told the jury that, although Beltre did not testify as to the time he claimed he was sodomized, it was noted in medical records that Beltre said "he arrived at [Petitioner's] house at 6:30." *Id.* at 764. Counsel argued this must have meant the claimed sexual acts took place sometime after 6:30 p.m. He then explained to the jury that the defense had called two alibi witnesses who each saw Petitioner at the after-school program: Moran saw Petitioner at 6:40 p.m., and Delarosa saw Petitioner between 6:30 p.m. and 6:33 p.m. Because of this testimony, counsel maintained that Petitioner could not have been at his home at 6:30 p.m. committing the alleged sexual acts. Counsel argued that if the jury accepted the alibi, then the crimes could not have occurred. *Id.* at 778.

Defense counsel also argued that according to the testimony of Aznali, it was "highly significant . . . scientific evidence that there was no saliva where they swabbed." *Id.* at 769. Counsel asserted that the lack of saliva on Beltre's penis also created reasonable doubt for the jury. *Id.* at 769-71. Finally, counsel argued that Beltre concocted the story that Petitioner had pressed his penis against Beltre's buttocks at the grand jury stage because police realized that the lack of saliva meant difficulty in proving the alleged accusation of sodomy. *Id.* at 766-67.

The prosecution argued on summation that the medical records, in which the defense asserted that medical examiners documented that Beltre stated he was sodomized at 6:30 p.m., in fact stated "approximately" 6:30 p.m. *Id.* at 795. Moreover, the prosecution maintained that

---

[2] Additionally, Petitioner introduced four photographs of the interior staircase at his boarding house.

5

even if Petitioner's alibi witnesses saw him at 6:40 p.m. or 6:33 p.m., it was "irrelevant" because "[n]o one here said that they knew where the [Petitioner] was from 5:50 to 6:30 p.m. on May 23rd." *Id.* at 802.

The prosecution then asserted that the alleged sexual acts were completed by 6:25 p.m. Beri saw Beltre arrive at the parents store at 6:45 p.m. According to the prosecution, this time frame was corroborated by the fact that police responded to the 911 call placed by Beltre's family by 6:55 p. m. Because Beltre testified it took him fifteen to twenty minutes to walk from Petitioner's house to Beltre's parents' store, the prosecution asserted that the entire sequence of sexual acts would have been completed by 6:25 p.m. As such, the prosecution argued that Petitioner could have completed the sexual acts and hurried back to the after-school program in time for the purported alibi witnesses to observe him in the classroom at 6:33 p.m. and 6:40 p.m., respectively. *Id.* at 803-05.

Despite the testimony of the two purported alibi witnesses and a significant portion of defense summation dedicated to the reasonable doubt the alibi witnesses created, Petitioner's counsel did not request, and the trial court did not give, an alibi instruction to the jury. On July 8, 2003, the jury announced its verdict convicting Petitioner of Sodomy in the Second Degree, three counts of Sexual Abuse in the Second Degree, and Endangering the Welfare of a Child. Petitioner was sentenced to concurrent prison terms of two-and-one-third to seven years for the sodomy conviction and one year for each of the three sexual abuse and the endangering convictions.

***Petitioner's Direct Appeal***

Petitioner raised two claims on direct appeal. First, Petitioner claimed he was denied a fair trial because the prosecutor's summation denigrated the defense, attempted to shift the

6

burden of proof to the defense, strayed from the evidence, and appealed to the jurors' emotions. Second, Petitioner claimed that his trial attorney was ineffective for failing to request an alibi charge.

The prosecution argued that Petitioner's claim of prosecutorial misconduct was unpreserved for appellate review. In any event, the prosecution maintained, the content of the prosecutor's summation did not deprive Petitioner of a fair trial, and so the prosecutorial misconduct claim was without merit. Furthermore, the prosecution argued that, to the extent that defense counsel may have made a single omission in failing to request an alibi charge, Petitioner was not prejudiced by this omission. Because Petitioner's alibi evidence was before the jury, and Petitioner had time to commit the crimes even if the jury accepted the alibi testimony, Petitioner was not prejudiced by his attorney's decision not to seek the charge.

On December 19, 2005, the Appellate Division of the Supreme Court of New York, Second Department, affirmed Petitioner's judgment of conviction. *People v. Urena*, 805 N.Y.S.2d 841(N.Y. App. Div. 2005). The Appellate Division held that Petitioner's claim of prosecutorial misconduct was largely unpreserved for appellate review, and in any event, without merit because the prosecutor's challenged remarks were either fair comment on the evidence, fair response to the defense summation, or constituted harmless error. *Id.* The court also held that Petitioner's ineffective assistance of counsel claim was without merit. *Id.*

In a certificate dated February 24, 2006, the New York Court of Appeals denied Petitioner's request to appeal further. *People v. Urena*, 6 N.Y.3d 819 (N.Y. 2006).

*The Instant Petition*

Petitioner timely filed the instant petition for a writ of habeas corpus on January 28, 2007, raising the same issues that Petitioner had exhausted upon his direct appeal: (1) that he was

denied his right to due process on the ground that the prosecutor committed misconduct during summation, and (2) that he was deprived of his constitutional right to effective assistance of counsel due to his trial counsel's failure to request an alibi charge.

Respondent asserted that Petitioner's prosecutorial misconduct claim was barred from review by an adequate and independent state ground, and would in any event be without merit. Respondent also argued that the state court's resolution of the ineffective assistance of counsel claim was not contrary to, or an unreasonable application of, clearly established Supreme Court law.

In his response, Petitioner conceded that the prosecutorial misconduct claim was procedurally barred. Petitioner maintained, however, that the failure of his trial counsel to request an alibi charge supported a claim of ineffective assistance of counsel.

The Court now turns to these claims.

## DISCUSSION

### I. Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant a writ of habeas corpus to a state prisoner on a claim that was "adjudicated on the merits" in state court only if it concludes that the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). An "adjudication on the merits" is a substantive, rather than a procedural, resolution of a federal claim. *See Sellan v. Kuhlman*, 261 F.3d 303, 313 (2d Cir. 2001) (citations omitted). A state court has adjudicated a state Petitioner's claim on the merits when it "(1)

disposes of the claim on the merits, and (2) reduces its disposition to judgment." *Bell v. Miller*, 500 F.3d 149, 155 (2d Cir. 2007) (quoting *Sellan*, 261 F.3d at 312).

Under § 2254(d)(1), the "contrary to" clause, a federal habeas court may grant the writ "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite" to that reached by the Supreme Court. *Bell v. Cone*, 543 U.S. 447, 452-53 (2005) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)). Under § 2254(d)(2), the "unreasonable application" clause, a federal habeas court may grant the writ if the state court "'identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of petitioner's case." *Rompilla v. Beard*, 545 U.S. 374, 380 (2005) (quoting *Wiggins v. Smith*, 539 U.S. 510, 520 (2003)). "[F]ederal law, as determined by the Supreme Court, may as much be a generalized standard that must be followed, as a bright-line rule designed to effectuate such a standard in a particular context." *Overton v. Newton*, 295 F.3d 270, 278 (2d Cir. 2002).

## II. Ineffective Assistance of Counsel

The Sixth Amendment ensures that "in all criminal prosecutions, the accused shall . . . have the Assistance of Counsel" for his defense. U.S. Const. Amend. VI. Although the Sixth Amendment does not expressly require that counsel be "effective," courts have found that the right to counsel inherently implies the right to effective assistance. As the Second Circuit has noted, the very "purpose of the Sixth Amendment guarantee of 'the Assistance of Counsel' . . . is to ensure that defendants have effective assistance of counsel." *Henry v. Poole*, 409 F.3d 48, 63 (2d Cir. 2005) (internal quotations and citations omitted).

Federal law relating to effective assistance of counsel was clearly established by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). That case established a two-pronged test for deciding ineffective assistance claims. To satisfy the first prong, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. Specifically, "[a] convicted defendant . . . must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at 690.

To satisfy the second prong, a defendant must demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. The Supreme Court defines "reasonable probability" as "a probability sufficient to undermine confidence in the outcome." *Id.* Further, "[t]he level of prejudice the defendant need demonstrate lies between prejudice that 'had some conceivable effect' and prejudice that 'more likely than not altered the outcome in the case.'" *Linstadt v. Keane*, 239 F.3d 191, 204 (2d Cir. 2001) (quoting *Strickland*, 466 U.S. at 693).

"[A] Petitioner cannot prevail on a claim of ineffective assistance merely because he disagrees with his counsel's strategy." *Singleton v. Duncan*, No. 03-CV-561, 2006 WL 73734, at *14 (E.D.N.Y. Jan. 10, 2006) (citing *Jones v. Barnes*, 463 U.S. 745, 752 (1983)). Indeed, "determinations regarding the defense strategy adopted at trial" are "[a]mong the 'virtually unchallengeable' tactical decisions left to the judgment of trial counsel." *Gluzman v. United States*, 124 F. Supp. 2d 171, 174 (S.D.N.Y. 2000) (citing *United States v. Simmons*, 923 F.2d 934, 956 (2d Cir. 1991)). Therefore, when applying the two-pronged test, "[j]udicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689. Courts assessing whether counsel was ineffective "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* The burden is on

the defendant to "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955) (internal quotations omitted)).

"[R]elief may be warranted when a decision by counsel cannot be justified as a result of some kind of plausible trial strategy." *Jackson v. Leonardo*, 162 F.3d 81, 85 (2d Cir. 1998). Ultimately, "[t]he relevant inquiry focuses 'on the fundamental fairness of the proceeding whose results are being challenged.'" *Bien v. Smith*, 546 F. Supp. 2d 26, 51 (E.D.N.Y. 2008) (quoting *Strickland*, 466 U.S. at 696). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

### A.   Counsel's Failure to Request an Alibi Instruction

Petitioner contends that trial counsel's performance fell below a standard of objective reasonableness when he failed to request an alibi charge, which would have instructed the jury that the prosecution was required to disprove the alibi defense Petitioner presented beyond a reasonable doubt. Petitioner also maintains that he suffered prejudice as a result because there was not an overwhelming amount of evidence supporting Petitioner's conviction and, but for his counsel's unreasonable omission, there is a reasonable probability of a different verdict had his counsel requested the alibi charge.

#### 1.   Prejudice

Petitioner must satisfy both the performance and prejudice prongs of *Strickland* in order to prevail on an ineffective assistance of counsel claim. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *Strickland*, 466 U.S. at 697. Based on the evidence presented at trial, there is no

reasonable probability that the outcome of Petitioner's trial would have been different if his trial counsel had requested an alibi charge. Although he failed to give timely notice, Petitioner's witnesses were allowed to testify that he was at a place other than the scene of the alleged criminal conduct. Petitioner fails the second prong of *Strickland*.

A defendant is not prejudiced by an absence of an alibi charge where the trial court conveys the same underlying principles to the jury as those present in the alibi instruction and the defendant is able to clearly state his alibi. *Turner v. Fischer*, No. 01-CV-3251, 2003 WL 22284177, at *9 (E.D.N.Y. Aug. 20, 2003) (no reasonable probability outcome would have been different had trial counsel requested alibi instruction in light of overwhelming evidence of defendant's guilt, where jury instructed in general about its duties to weigh testimony and the burden shouldered by prosecution, and defendant stated alibi clearly so that the jury was free to accept or reject it); *Parreno v. Annetts*, No. 04 Civ. 10153, 2006 WL 689511, at *13 (S.D.N.Y. Mar. 20, 2006) (defendant not prejudiced from lack of specific alibi instruction where jury instructions contained key concepts of an alibi charge, defense argued alibi defense at length during summation, and alibi defense was particularly weak); *Howard v. Riley*, No. 90 Civ. 6735, 1991 U.S. Dist. LEXIS 9662, at *10-11 (S.D.N.Y. July 16, 1991) (defendant not prejudiced by lack of alibi charge where trial court gave exhaustive charge concerning reasonable doubt, burden of the prosecution, role of identification, and other elements of the case to make it clear the government bore the entire burden). Comparing the trial court's instructions to the alibi instruction to which petitioner alleges he was entitled, it is evident that, as a whole, the trial court's instructions to the jury conveyed the same essential principles. The New York pattern alibi instruction states in part:

> [T]he defendant does not have the burden of proof in a criminal case. Rather, the prosecution must prove the defendant's guilt beyond a reasonable doubt and must

> also disprove the alibi defense beyond a reasonable doubt . . . . The defendant is not obliged to establish that it was impossible for [him/her] to commit the crime charged. If, under the evidence presented to prove the defendant's alibi, it may still have been possible for the defendant to have committed the crime, it is for you to determine whether the defendant availed [himself/herself] of that possibility.
>
> In conclusion, if the proof as to alibi, in and of itself, or when taken into consideration with all the other evidence, creates a reasonable doubt as to the defendant's guilt, [he/she] is entitled to be found not guilty.

Howard G. Leventhal, 1 Charges to Jury & Requests to Charge in Crim. Case in N.Y. § 5:7 (2009).

At the start of the trial, the court told the jury that "every person accused of a crime is presumed innocent . . . this presumption remains with the Defendant throughout the trial." Tr. 66. At the end of trial, the court instructed the jury that:

> In determining whether the People have satisfied their burden of proving the Defendant's guilt beyond a reasonable doubt, you may consider all the evidence presented, whether by the People or by the Defendant. In doing so, however, you must remember that even though the Defendant introduced evidence, the burden of proof remains on the People. The Defendant is not required to prove that he is not guilty. . . . That means before you could find the Defendant guilty of the crime, the People must prove beyond a reasonable doubt every element of the crime, including that the Defendant is the person who committed it.

*Id.* at 832. Moreover, the trial judge instructed the jury that the "[b]urden of proof never shifts from the People to the Defendant." *Id.*

The trial court's actual instructions to the jury contain the same essential principles as the pattern alibi instructions. In both, it is critical that the prosecution bears the burden to prove guilt beyond a reasonable doubt and that this burden does not shift to the defendant. In both, the presence of a reasonable doubt that the defendant committed an element of the crime compels the jury to vote for acquittal. Considering the common principles of the trial court's given instructions and the alibi instructions that would have been given, Petitioner fails to demonstrate

there is a reasonable probability that the jury would have voted differently if the alibi charge had been given.

Furthermore, Petitioner's counsel clearly stated the alibi during summation. Counsel asserted that the testimony of the alibi witnesses alone created a reasonable doubt, and that if the jury "accept[s] this alibi on its face as credible evidence" then Petitioner could not have committed the alleged crimes. Tr. 778. Counsel then added, "I am confident you are going to realize they [the prosecution] didn't prove the case. And you also know if they don't prove it, that's it." *Id.* 787. In doing so, Petitioner's counsel highlighted the relevant standard the jury must consider when looking at alibi evidence.

The prosecution's summation emphasized that Petitioner's purported alibi witnesses' testimony, even if believed by the jury, in no way contradicted the prosecution's timeline of events. One testified that he saw Petitioner at 6:33 p.m. and the other at 6:40 p.m., respectively, at the after-school program. The prosecution contended that the sexual acts committed by Petitioner were completed by 6:25 p.m. The building where the after-school program was held was approximately eight blocks away. Therefore, the jury could reasonably conclude that Petitioner's purported alibi did not establish that he was elsewhere during any of the time period the sexual acts were committed. Petitioner has not met his burden under *Strickland* to demonstrate a reasonable probability that the outcome of the trial would have been different if the court had given the jury specific alibi instructions.

### III. Prosecutorial Misconduct

Petitioner initially claimed in this petition that he was denied his right to due process on account of prosecutorial misconduct during summation. The Appellate Division held that Petitioner's "contention that improper remarks made by the prosecutor during summation

deprived him of a fair trial is largely unpreserved for appellate review." *People v. Urena*, 805 N.Y.S.2d 841(N.Y. App. Div. 2005). The Appellate Division then stated that in any event, the claim was without merit. *Id.* In his reply brief, Petitioner stated he "will not respond to Respondent's opposition to the claim of prosecutorial misconduct since Petitioner recognizes that under *Coleman v. Thompson*, 501 U.S. 722, 739 (1991), the claim is procedurally barred." Pet. Aff. 4 n.1.

The Supreme Court has held that claims underlying a habeas petition may be procedurally barred from review if they were decided by the state courts on adequate and independent procedural grounds. *Coleman*, 501 U.S. at 729-33. In particular, the procedural bar applies when a state court's decision contains a plain statement that it is relying on an appropriate state law to deny a claim. *Michigan v. Long*, 463 U.S. 1032, 1042 (1983). The Appellate Division's decision contains a plain statement that Petitioner's prosecutorial misconduct claim was procedurally barred. Although the decision contains an alternative holding, stating that in any event the claim was without merit, the claim is nonetheless procedurally barred from review. *Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989) ("a state court need not fear reaching the merits of a federal claim in an alternative holding"). Petitioner is, therefore, correct in conceding that the prosecutorial misconduct claim is procedurally barred because the Appellate Division relied on an adequate and independent state ground in deciding this claim. *See Greene v. Brown*, No. 06 Civ. 5532, 2007 WL 1589449, at *23 (S.D.N.Y. June 4, 2007) (failure to object to prosecutor's remarks during summation is procedural bar to a claim of prosecutorial misconduct in New York, and this is adequate and independent state ground for precluding habeas relief) (citing *Vargas v. Keene*, 86 F.3d 1273, 1280 (2d Cir. 1996)).

## *CONCLUSION*

For the reasons set forth above, the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied and the case is dismissed. Since Petitioner has not made a substantial showing of the denial of a constitutional right, no certificate of appealability is granted with respect to Petitioner's claims. *See* 28 U.S.C. § 2253(c)(2); *Lozada v. United States*, 107 F.3d 1011, 1017 (2d Cir. 1997) (discussing the standard for issuing a certificate of appealability), *abrogated on other grounds in United States v. Perez*, 129 F.3d 255, 259-60 (2d Cir. 1997).

**SO ORDERED.**

SANDRA L. TOWNES
United States District Judge

Dated: March 24, 2010
Brooklyn, New York